[Civ. No. 16029.   First Dist., Div. One.   Jan. 14, 1955.]

Estate of MARIAN MERCER JONES, Deceased. CROCKER FIRST NATIONAL BANK, as Trustee, etc., et al., Appellants, v. ST. LUKE'S HOSPITAL (a Corporation), Respondent.

John U. Calkins, Jr., Maurice E. Gibson, Charles Albert Adams and Henry C. Clausen for Appellants.

Myrick & Deering and Scott for Respondent.

BRAY, J.—After a hearing on the petition of respondent as beneficiary of a trust created in the will of Marian Mercer Jones, deceased, an order instructing successor trustee as to administration of trust and construing endowment agreement was entered. From this order Crocker First National Bank, as successor trustee, and the Regents of the University of California, as residuary beneficiary, appeal.

### QUESTIONS PRESENTED

1. The construction of the will as to the endowment provided therein for St. Luke's Hospital and particularly whether said endowment was or was not to be increased from time to time. This includes the question of whether prior court orders are res judicata of this subject. 2. Did the court have the power to instruct respondent concerning the selection of the beneficiaries of the endowment? 3. Was respondent entitled to attorney's fees?

### RECORD

February 14, 1949, a decree of distribution was filed in said estate distributing to the then testamentary trustee pursuant to the terms of the will of said decedent all of her estate. Said trustee then petitioned the superior court for instructions

and advice as to the endowment to respondent provided in said will. Thereupon the court made its decree authorizing and directing payment of endowment to St. Luke's Hospital. In this order the court directed the trustee to pay respondent $150,000 in cash or securities for the endowment provided in the will and to execute a contract with respondent in form satisfactory to him to effect such endowment. The trustee transferred to respondent securities of the said value and entered into the contract with respondent dated May 18, 1950, hereafter discussed. June 9, 1950, the then trustee filed his first report and account reporting the transfer of said securities and the execution of said contract and asking court approval thereof. June 23, 1950, said account and the execution of said contract were approved by the court. June 10, 1953, the order in controversy here was made. It found that to effectuate the intention of the testatrix as to the endowment for respondent the trustee must keep the fund for it "sufficient"; that the fund is now insufficient; that it would be proper for the hospital to be given sufficient additional sums to enable it to diversify the investments of said fund to maintain a ratio of approximately 50 per cent in stocks and 50 per cent in bonds and to obtain a return of $11,000 per year; that this would require an endowment fund of $274,000; that the intention of the testatrix was that the hospital was to furnish free service to such women in reduced circumstances as the hospital might select provided it recognized the preferential rights of members of the Protestant Episcopal Old Ladies' Home; that the hospital attorneys should be awarded $4,000 fees from the preferential trust, and that neither the prior court decrees nor the contract prevent subsequent augmentation during the existence of the preferential trust (life annuitants). Judgment was entered accordingly.

## TERMS OF TRUST

The portions of the will important here follow. The trustee was to pay out of income and if necessary, corpus, specified sums monthly to specified persons. The trust was to continue until the last of these specified persons died or until annuities had been purchased for all of said persons, in the event the trustee elected to purchase them. When the trust terminated the balance of capital fund and income then in the hands of the trustee should be transferred to the trust provided in provision sixth and be disposed of as therein provided. The trustee was empowered from time to time to

determine "and said Trustee's determination shall be final" whether there was a surplus in the capital fund beyond that which was necessary to insure the payments above mentioned, and if the trustee should determine there was such surplus, it should be transferred to the trust provided in provision sixth and be disposed of as provided therein.

Provision sixth provided a second trust subordinate to the payments above mentioned and to others not relevant here. It first provided for the trustee to have installed a stained glass window at such cost as the trustee might determine in Grace Cathedral and St. Luke's Church. Secondly, it provided that the trustee endow three rooms in the Protestant Episcopal Old Ladies' Home, and to pay from the trust estate such amount as in the opinion of the trustee might be necessary to endow said three rooms to be used in accordance with the rules of said institution, each room to be named as provided in the will.

Then follow the provisions most necessary to be construed in this controversy. After the trustee shall have installed the windows and endowed the rooms above mentioned, "I authorize and empower said Trustee to use such amount of said trust estate as he shall deem proper to endow a room in *ST. LUKE'S HOSPITAL,* in San Francisco, California, for the free use by women in reduced circumstances (preferably members of the Protestant Episcopal Old Ladies Home) in accordance with the rules and regulations of said hospital, which endowment I desire named after my mother and to be known as the 'MARGARET J. JONES ENDOWMENT.'

"(5) I authorize and empower said trustee, at any time and from time to time during the term of said trust, to determine, and his determination shall be final, whether there is more property in said trust estate than is necessary to insure the carrying out of the foregoing provisions of this paragraph 'SIXTH', and if he shall determine that there is an excess he is authorized and empowered thereupon to transfer and deliver to the *REGENTS OF THE UNIVERSITY OF CALIFORNIA* such excess of said trust property, free and clear of said trust, for an endowment fund named for my father and mother . . ." to be used for loans to students as therein set forth.

It is the position of both appellants that under the will and particularly paragraphs 4 and 5 of provision sixth that it was the intention of the testatrix that an endowment of a single sum be made, while respondent contends it was her intention

that the endowment be a continuing one. Additionally, appellants contend that the testatrix intended that the power to determine the amount of the endowment was vested solely in the trustee, that he exercised that power, that the court later approved his determination and thereby the power became *functus officio*. Respondent negatives this contention.

### THE CONTRACT

In it the trustee agreed to transfer to respondent securities of the value of $150,000 and respondent "agrees to accept the same *pursuant to and in fulfillment of* said provision of said will . . ."* Respondent agrees to provide a room in its hospital "continuously, for the free use by women in reduced circumstances (preferably members of the Protestant Episcopal Old Ladies Home)" and "to furnish continuously and perpetually to such persons, who are to be women selected and designated by the Protestant Episcopal Old Ladies Home, the full services of the hospital . . .

"3. Except as hereinafter provided, said securities shall be owned and held by Second Party, and the net income therefrom shall be used in accordance with the rules of Second Party to maintain the said room and care for such patients as aforesaid, in perpetuity; and in the event that Second Party shall hereafter find that it is impossible for it to maintain said room and care for such patients, as aforesaid, from the net income of said trust as herein provided, or for any other reason it is unable or unwilling to perform its obligations under paragraph 2 of this agreement, it may, upon written notice to First Party herein and said Protestant Episcopal Old Ladies Home and the Regents of the University of California, apply to the Superior Court of the State of California, in and for the City and County of San Francisco, for appropriate relief; and Second Party shall continue to perform its obligations as above provided to the extent that the income from such fund shall permit until said court shall determine what relief shall be granted in said action; provided that if the relief granted by said court in said action shall be inadequate or unsatisfactory in the opinion of the Board of Trustees of Second Party, then Second Party shall have the right to terminate this agreement and the fund shall then be disposed of as directed by said Superior Court; provided always that the provisions of said Last Will and Testament of said decedent (including the provision thereof relating to said preferential

---

*Unless otherwise noted, all emphasis added.

rights of said Protestant Episcopal Old Ladies Home) shall be carried out and effectuated as far as practicable under the then existing conditions."†

In 1950 the average cost of a hospital room per patient day was about $19.62 and the income from the stocks transferred to respondent by the trustee was adequate to meet the then situation. By 1953 the estimated cost per patient day was $30. Early in 1952 the attorney for the hospital wrote the trustee requesting that steps be taken " 'to *insure* the carrying out' " of the will, in view of the "alarming increase of cost of hospital care." (Emphasis not added.) The trustee declined to do anything. The endowment fund has increased to $198,519, producing an annual yield of $10,125.97 in 1952. Of that year there was a surplus of $11,656.52 which respondent had not used, because it was uncertain whether under the contract it could be used to aid women other than members of the Old Ladies' Home, nominated by it. Under the "prudent man rule" respondent desired to change the endowment corpus from all stocks (as now) to approximately equal amounts of stocks and bonds, and to receive from the trustee additionally approximately $70,000. This sum together with the present endowment fund, if invested in stocks and bonds yielding 4 per cent, would produce approximately $11,000, a sum sufficient to take care of one patient per year at the present cost of $30 per day.

The preferential trust consists of cash and securities appraised at $542,428.90 and a surplus of $25,986.58. In the subordinate trust (provision sixth trust) there are stocks appraised at $198,519.

### 1. *Intention of Testatrix.*

Did she intend that the endowment made to respondent was to be one payment or was it to be added to during the existence of the preferential trust?  ██  " . . . the duty of the court is to first ascertain and then, if possible, give effect to the intent of the maker" of the will. (*Estate of Gump*, 16 Cal.2d 535, 548 [107 P.2d 17].)  ██  As the determination of the testatrix's intent and the construction of the will are based solely upon the will itself, without the aid of evidence, this court is not bound by the construction given by the trial

---

†Randolph V. Whiting, the trustee appointed by the will, functioned as such until his death, which was after the execution of the contract with respondent and the transfer of the securities to the latter. Thereupon, under the terms of the will, appellant Crocker Bank became and now is the successor trustee.

court, and is required to make the final determination in accordance with the applicable principles of law. (*Estate of Platt*, 21 Cal.2d 343, 352 [131 P.2d 825].)

In her will the testatrix first provides that the trustee shall pay certain persons monthly sums, from the income of the capital fund left for that purpose, and if necessary from the capital itself. The trustee may, if he sees fit, purchase annuities for all or any of said persons. If annuities are purchased for all, then, or at the death of the last annuitant, this trust (called preferential) terminates and all funds, either capital or income, go to the trust provided in the sixth provision (called the subordinate trust), which includes the endowment to respondent, to "be disposed of as therein provided for the disposal of assets" in that trust. The trustee may from time to time in his absolute discretion determine if there is a surplus in the preferential trust beyond the moneys necessary to take care of the annuitants, and may transfer such surplus to the subordinate trust to be disposed of as provided for the disposal of assets in the latter trust. The subordinate trust must take care of two matters before proceeding to the endowment for respondent: (1) It must install a stained glass window in each of two churches. (2) It must "endow" three rooms in the Old Ladies' Home in the names of certain persons. (There is no provision or restriction as to the *use* of these rooms.) Then the trustee shall "use such amount . . . as he shall deem proper to endow a room in *ST. LUKE'S HOSPITAL* . . . for the free use by women in reduced circumstances . . ." ". . . at any time and from time to time during the term of said trust" the trustee may determine, in his absolute discretion "whether there is more property in said trust estate than is necessary to insure the carrying out of the foregoing provisions of this paragraph 'SIXTH,' and if he shall determine that there is an excess" he is authorized to transfer such excess to the Regents.

Under provision sixth the necessary expenditures for the first two matters contained therein were required to be over and done with before the trustee could act on the endowment. Taking the language in paragraph 4 of provision sixth "to endow a room . . . for the free use by women in reduced circumstances" alone requires the conclusion that it meant one sum only.* However, it is contended that when taken in

---

*"Endow: To furnish with money or its equivalent, as a permanent fund for support; . . . as, to *endow* a hospital, or scholarship." (Web-

conjunction with provision third giving the trustee the power from time to time to transfer surplus from the preferential trust to the subordinate trust and with the authority given the trustee in paragraph 5 of provision sixth, "at any time and from time to time" during the term of the preferential trust, to determine if there is more property in the provision sixth trust than is necessary to do the three things required of the trust, and if so, to give such excess to the Regents, a different conclusion must be reached. Thus it is claimed that if the endowment was to be but a single payment there would be no necessity for the trustee as provided in paragraph 5 of provision sixth to ascertain if there is a surplus beyond that which "is necessary to insure" the payments required by the preferential trust, in order to give that surplus to the Regents. This reasoning, however, overlooks the fact that although the construction of the church windows and the endowment of the three rooms at the Old Ladies' Home had preference over the endowment to respondent, and all three had preference over payments to the Regents, nevertheless if in the judgment of the trustee there were sufficient funds to *insure* the accomplishment of these three requirements, this clause would permit the trustee to pay any surplus to the Regents before completing the three projects.

Moreover, paragraph 5 is in nowise dispositive. Nor is paragraph 3 of provision third, which authorizes the trustee from time to time to transfer surplus beyond that necessary to insure the payment of the annuitants, from the preferential trust to the subordinate trust, and which paragraph respondent contends, like paragraph 5 of provision sixth, indicates the testatrix's intention to make the hospital endowment a continuing one. Both of these paragraphs deal with the handling of the trust funds and the determination of whether surplus is available to be transferred from one fund to another. The only clause providing for any disposition to respondent is paragraph 4 of provision sixth.

It is significant that in paragraph 3 testatrix *directed* the trustee in endowing the three rooms in the Old Ladies' Home

ster's New International Dictionary, 2d ed.) "The term 'endowment,' therefore, has received a rather definite meaning from the Courts, to wit, that it is a bestowment of moneys as a permanent fund, the income of which is to be used for a proposed work, and 'to endow' is, of course, to create or provide an endowment. The common and ordinary meaning of the words 'to endow a room' would therefore be 'to provide a permanent fund, the income of which is to be used to maintain a room.'" (*In re Pelton's Will*, 74 N.Y.S.2d 743, 746.)

to pay such amount as in his opinion "shall be *necessary* to endow," while in paragraph 4 the trustee is not *directed* but authorized, in endowing the room in St. Luke's Hospital, to use such amount "as he shall deem *proper*." At the time of making her will the testatrix could not be sure as to how long it would take the trustee to negotiate the endowments and therefore provided in effect that the trustee might transfer excess to the Regents before completing the endowments. This very provision for payment of excess to the Regents is another evidence that testatrix contemplated a one payment endowment. If it were contemplated that the endowment was to be a continuing one, dependent upon the fluctuation of income on investments handled not by the trustee but by the hospital board, it is doubtful if the trustee would ever before the termination of the trust be in a position to determine what would be the requirements of the endowment and hence whether or not there was any excess in the fund.

Moreover, the trust would never terminate. Even after the termination of the preferential trust, the trustee would have to keep funds on hand to meet the possibility of hospital costs continuing to increase from time to time, requiring more funds to be given respondent. Although he had the discretion to make a determination, he might feel that he could not reasonably do so.

The construction of the will which we have given was the construction given by the trial court in its previous orders and by the trustee and respondent in the contract. In the "Petition . . . for Instructions and Advice as to St. Luke's Hospital Endowment" the trustee stated that he held certain described stocks "available for use for the creation of said endowment" and that stocks of the aggregate value of $150,000 "are necessary and reasonable for such purpose," asked that he be authorized to select stock in that amount "and transfer the same to *ST. LUKE'S HOSPITAL for the endowment above set forth*" and that he be authorized to execute a "proper contract to effect such endowment. . . ." The "Decree Authorizing and Directing Payment of Endowment to St. Luke's Hospital" stated that the trustee had petitioned for instructions and advice "as to St. Luke's Hospital endowment," and then provided that "pursuant to said Will" the trustee was authorized and directed to select securities of the aggregate value of $150,000 and transfer them to respondent "for the endowment above set forth" and to execute a contract "to effect such endowment." While it is nowhere stated

in the petition or order that this is to be a one payment endowment, no other construction is reasonable or logical. The same is true of the contract thereafter drawn and the order expressly approving it and the transfer to respondent of the securities. In the "First Report and Account of Testamentary Trustee," the latter reported the transfer of the securities and the execution of the contract, copy of which was annexed. This agreement sets forth paragraph 4 of provision sixth of the will, and then states that the trustee holds certain described stock of the aggregate value of $150,000 "for *use for the creation of said St. Luke's Hospital endowment*" and that said stocks "are *necessary and reasonable for such purpose* and have been selected by him *for said endowment. . . .*" Respondent then agrees to accept the transfer of said stock "*pursuant to and in fulfillment of* said provision of said will," and to provide a room in its hospital continuously. It agrees "to furnish continuously and *perpetually*" to the women entitled thereto the full services of the hospital, etc. The stock is to be owned and held by respondent and the net income therefrom to be used to maintain the said room and care for such patients *in perpetuity.*

The contract provides, also, that respondent will keep separate from all other property of respondent, in a fund to be known as the "Margaret J. Jones Endowment" said securities "and any other property which shall hereafter be acquired *in the place thereof,* and the income therefrom." If it were contemplated by the parties or the court in approving the contract, that additional funds might be given respondent for the endowment, it seems reasonable to assume that this clause would not have limited the Margaret J. Jones Endowment Fund to the securities and property to be acquired in their place, and the income, but there would have been an additional clause similar to "and other property or funds which hereafter may be given for this purpose."

Then comes a most interesting provision, in view of respondent's contention that a continuing endowment was contemplated, —if respondent shall hereafter find it to be impossible to maintain said room and care from the net income of the trust provided in the agreement, or for any other reason is unable or unwilling to perform its obligations it may apply to the superior court for appropriate relief, and if the relief granted *by the court* is inadequate or unsatisfactory, respondent may terminate the agreement and the fund shall then be disposed of as directed by the court, provided al-

ways that the provisions of the will shall be effectuated as far as practicable *under the then existing conditions*. There is no provision for further moneys from the trustee. Moreover, in case the corpus of the fund being given respondent is insufficient for the purposes of the trust thereby created, respondent must look, not to the trustee who would be the logical one to give relief if the will contemplated further donations from the trustee, but to the court whose only power would be to allow a reduction in the services to be rendered or to apply some form of *cy pres*. The "Decree Approving and Settling First Report and Account of Testamentary Trustee" approves the account and report as filed, and the agreement with respondent. The only reasonable interpretation of these court orders under the circumstances is that the court as well as the trustee and respondent, construed the will as we do, namely, that the endowment was not to be one in which continuing payments were to be made. The trustee was to use such "amount" (not "amounts"), as he "shall deem proper."

The trial court made a finding that at no time during the proceedings in which the prior orders were made were the provisions of paragraph 5, provision sixth, urged, raised or considered, nor were they necessary to any decision and that consideration of them would have been premature. That they were not raised in so many words is true, but they must have been considered. Their consideration would not have been premature, because, in passing upon the trustee's petition for advice and permission to transfer the securities which petition referred "particularly to the Will," as well as in the later order passing upon the contract, the court would be required to know whether a full payment was being made or merely a part payment. While the court orders did not spell this out in so many words, such is the effect of the orders. Continuing payments are completely inconsistent with the determination in these orders that the transfer of the $150,000 securities was pursuant to and in fulfillment of the terms of the will. As was the order made upon the trustee's petition for instructions in *Estate of Keet*, 15 Cal. 2d 328 [100 P.2d 1045], each order "became a final determination of the matters adjudged . . ." (P. 333. See also *Smith* v. *Williams*, 66 Cal.App.2d 543 [152 P.2d 465].) *Griffen* v. *Keese* (1907), 187 N.Y. 454 [80 N.E. 367] is not in point. There the testator created a number of annuities and directed that his executors set apart and invest " '. . . a fund sufficient to produce the several annuities . . .' " (P.

368 [80 N.E.].) The court held that a prior decree holding that the amount set apart to produce these annuities was proper and sufficient at that time, would not bar either a raising or lowering of the fund at a later date, as it was clear from the terms of the will that the testator did not intend to create "a fixed and immutable fund."

In *Merriam* v. *Merriam* (1900), 80 Minn. 254 [83 N.W. 162], the will required the trustees to set aside sufficient securities to produce an annual net income of at least $8,000 to be paid the testator's wife as long as she lived. The trustees set apart securities that produced that income. However, as time went on, their yield did not produce that income. The court held that the intention of the testator was not to provide an unchangeable fund, but that the fund was to be kept sufficient to provide the designated income. *Merritt* v. *Merritt* (1887), 43 N.J.Eq. 11 [10 A. 835] and *In re McKenna's Estate* (1940), 173 Misc. 579 [18 N.Y.S.2d 482], were cases similar to the Merriam case. In each the will required the trustees to invest sufficient funds to produce and pay specified yearly amounts to the beneficiaries. Obviously such situations are different than in our case as in those cases it definitely appeared that the particular testator required the payment of the specified sums annually which could not be done if the fund from which the income came were not increased when necessary.

Respondent cites *Estate of Ferrall*, 92 Cal.App.2d 712 [207 P.2d 1077], seemingly to support its contention that the court could order, as it did here, the trustee to increase the amount of the endowment. Were this a continuing endowment and the trustee refused arbitrarily to act, that case might support respondent's contention. But this is not a continuing endowment, and no contention has been made that the trustee acted in bad faith in making the single payment. The Ferrall case supports the action of the trustee here (pp. 715-716): "Section 2269 of the Civil Code provides: 'A discretionary power conferred upon a trustee is presumed not to be left to his arbitrary discretion, but may be controlled by the proper court if not reasonably exercised, unless an absolute discretion is clearly conferred by the declaration of trust.' An absolute discretion, as to the amounts to be paid from the corpus, was conferred by the trust provisions herein. An absolute discretion, exercised in good faith by a trustee, cannot be controlled by a court on considerations going to the soundness of the discretion so exercised."

Under the terms of the will, the trustee, in his absolute discretion had the power to determine the amount of the endowment. Having done so, and no power being granted to the trustee in the will to continue making payments to respondent, the court had no power to order any additional amounts to be given respondent. In view of our holding in this respect it becomes unnecessary to consider whether the decree is ambiguous as to the amounts to be paid respondent by the trustee, and other questions raised.

2. *Instructions to Hospital.*

In its order the court found that it was the intention of the testatrix, and so instructed respondent, that the income from the endowment is to be used to furnish hospital services to such women in reduced circumstances as respondent may select, provided that at all times it recognize the preferential right of members of the Protestant Episcopal Old Ladies' Home to receive such services. Appellant trustee contends that this instruction is inconsistent with the provisions in the contract which the court previously approved, and that such approval is res judicata of the question of selection. We agree with this contention. Paragraph 2 of the contract provides that respondent agrees to provide a room in St. Luke's Hospital for the use "by women in reduced circumstances (preferably members of the . . . Old Ladies Home) . . ." It then goes on to say that respondent agrees to furnish perpetually "to such persons, *who are to be women selected and designated by* the . . . Old Ladies Home, the full services of the hospital . . . including a one-bed private room of a type that shall be *satisfactory to said Home.*" In approving the contract in that form the court construed the terms of the will to require the selection of the women to benefit from the endowment to be made by the Old Ladies' Home. The trial court on the hearing of the present petition had no power to again determine that question, even though it might be that the will intended only that women from the home be given preference and not that the home was to select the other women to be benefited in case there were no women from the home needing hospital care. (See *Estate of Keet, supra,* 15 Cal.2d 328.)

The instruction by the court to the hospital that it might change the securities held by it from stocks to stocks and bonds was a matter within the equity power of the court. We doubt, however, if it was necessary for respondent to obtain such instruction. Under the contract respondent was

expressly given full power to sell, invest and otherwise deal with said securities as if they were its own property, as long as such action was taken for the purposes of the endowment. This would give respondent the right to reinvest in such type of securities as it deemed for the best interests of the endowment fund.

### 3. *Attorney's Fees.*

█ The award of attorney's fees to respondent here comes within the principle set for in an annotation in 9 A.L.R.2d 1132, pages 1182-1183: "It is sometimes expressly recognized that where the provisions of the will are actually ambiguous and the commencement of a suit for construction is necessitated thereby or, at least, constitutes a perfectly reasonable step, an allowance for costs or attorneys' fees may be made either to the trustee or to the complainant beneficiary." This proceeding is different from the one in *Estate of Marré*, 18 Cal.2d 191 [114 P.2d 591], where the beneficiary of the trust sought additional sums from the trust for his own support, maintenance and education. Here respondent sought additional sums, and clarification of rights, not for itself but for a class which testatrix desired to favor,—women in reduced circumstances.

". . . whenever a will making bequests to charity has to be judicially construed to clear up ambiguities, the expenses of the suit, including an attorney's fee for the defeated party, are to be paid out of the testator's estate." (11 C.J., 370, Charities, § 98.)

Until the question of the nature of the endowment provision of the will was determined, the trustee would never be able to determine whether he could start paying surplus to the Regents. Therefore, this litigation was "a benefit and a service to the trust" which in *Dingwell* v. *Seymour*, 91 Cal. App. 483 [267 P. 327], was deemed to be "the underlying principle which guides the court in allowing . . . attorney's fees . . ." (P. 513.)

Those portions of the order authorizing respondent to diversify the investment of the endowment funds and allowing respondent attorney's fees are affirmed. In all other respects the order is reversed.

Peters, P. J., and Wood (Fred B.), J., concurred.

A petition for a rehearing was denied February 11, 1955, and respondent's petition for a hearing by the Supreme Court was denied March 9, 1955.